## Scott v. Commonwealth.

Oct. 16, 1945.

128

J. B. Johnson, L. O. Siler, and H. H. Tye for appellant.

Eldon S. Dummit, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Reversing.

Appellant was convicted of manslaughter, and sentenced to serve twenty-one years in the State Reformatory. His first ground for reversal is that the Court erred in overruling his motion for a directed verdict of acquittal.

Appellant is forty-eight years of age, and previous to an injury he sustained to his back, was engaged in the occupation of mining coal. For several years after his injury, he was engaged as an employee of the Williamsburg Water Plant; but at the time of the homicide, and for two months previous thereto, he was employed by the City of Williamsburg as a night policeman. The deceased, Wiley Ball, twenty years of age, was a resident of Whitley County, and lived near the City of Williamsburg. He was addicted to excessive use of intoxicating beverages, and frequently became intoxicated in public places. On those occasions he became boisterous, quarrelsome, and abusive. The Police Department of Williamsburg often was called upon to quell disturbances he caused; and on nearly all such occasions he resisted arrest, and vilified and abused the officers. At the time appellant became a member of the police force, Ball's reputation for such conduct was widespread and very bad. On two or three occasions previous to the homicide, Scott made remarks to the effect that, if he were ever called upon to arrest Ball, he would either arrest him or they would take Ball to the undertaker, and that he would show the people he could arrest Ball. On the night of December 27, 1944, Ball, with several companions, was in Powers Restaurant, and apparently raising a disturbance. At the request of the management, Scott told the young men to cease

drinking on the premises; and when the restaurant closed about midnight, he told the group to get off of the streets. After this admonition, appellant cruised the streets in his patrol car, and within a short time encountered the same group of men. Appellant testified that Ball was cursing and abusing some of his companions; appellant separated the group, and accompanied Ball toward the bridge which led out of town toward the latter's home. After walking a short distance, Ball drew a knife and said to appellant, ''Hell, you are trying to arrest me and you can't do it.'' Appellant then placed Ball under arrest, but the latter broke away and, calling appellant a ''son of a bitch,'' ran away. Appellant went to the home of Isham Alder, a constable residing in Williamsburg, awakened Alder, and requested him to accompany him for the purpose of again placing Ball under arrest. Appellant proceeded to the street in front of Alder's apartment, and waited there while Alder dressed. Before Alder arrived, Ball appeared and again engaged in an argument with appellant. In this conversation Ball threatened ''to cut appellant's head off,'' in general used abusive language toward him, and backed him into the street. Appellant testified that Ball had an open knife in his hand. When the constable arrived at the scene, appellant was backing away with Ball in pursuit. Alder told Ball to go with the officer, whereupon Ball again ran away. The officers pursued him, and, at appellant's direction, Constable Alder stationed himself near the bridge Ball would have to cross in going home. Appellant went in close pursuit of Ball, and when out of the sight of Elder fired two shots, which he testified were fired into the air; at any rate, neither of them struck the deceased. Ball was then observed by both officers running toward a tin warehouse. The officers followed, but could not find him, and were returning to Alder's apartment when they encountered the Jailer of the County, who told them that Ball was then in Alder's home. Before the officers arrived at the apartment, Ball, stumbling and groping, made his way to Alder's dining room and was observed by Mrs. Alder, who was awakened by the commotion. She testified that Ball emptied some groceries out of a basket or sack, and then entered an automobile which the constable had parked for his use in front of the apartment. When the officers arrived, Mrs. Alder told them where they

could find Ball; they then proceeded to the automobile. Appellant shook the deceased and attempted to awaken him, but he did not respond; thereupon, the officers entered the car and Alder started the motor. At that time Ball raised up and said, "I'll not go anywhere with that damn man," meaning appellant. The constable told him to go with the officer before he got hurt, and Ball said, "Let him hurt, I am not going anywhere with him." Ball pulled off a raincoat he was wearing and challenged Scott in the following language: "If you will pull that pistol off and lay that Goddamn billy down I'll beat hell out of you." Alder again told Ball to go with Scott, and Ball again responded that he would not go anywhere with him. Both officers alighted from the car, appellant on the right side and Alder on the left. At that time Ball was sitting in the rear seat with his hand on the back of the front seat. Appellant told him to get out of the car and come with him. By that time Alder had walked in front of the car, and was blinded by the headlights. He heard appellant shout, "Drop that knife," and he then heard three or four pistol shots. Appellant testified that Ball started to get out of the car, open knife in hand, and said, "I'll cut your God damn heart out." He then lunged as if he were coming out of the car, and appellant fired two shots, which entered the chest slightly to the left of the heart; one of these, or maybe a third, passed through the elbow. Scott testified that he retrieved the knife from the floor of the car; and both officers testified that appellant gave Alder an open knife with the remark, "Here's his knife." Previous to that time Alder had not seen the knife. Alder felt the deceased's pulse and found him to be dead. He then asked appellant what they should do, and appellant said, "Take him to the morgue."

This testimony is contradicted in only one particular. Edna Rains, a seventeen-year old girl who was spending the night with Mrs. Alder, witnessed the shooting from an upstairs window some twenty feet away. Her testimony corroborated the testimony of Alder and appellant, except she testified that Scott said, "I'll shoot your God damn heart out;" whereas appellant testified that Ball said, "I'll cut your God damn heart out." Appellant's version is corroborated to some extent by Alder, who said that Ball made some remark as he (Alder) slammed the left front door, but the noise of the door pre-

vented him from hearing what was said. We think that this discrepancy in the testimony should be resolved in favor of appellant, considering the partial corroboration by Alder; the fact that Miss Rains is a young girl, who no doubt was under the stress of unusual excitement; and further considering the fact that for over an hour Ball had been abusing, threatening, and using similar language. At the time he fired the fatal shots, appellant was standing three or four feet from the automobile. It is claimed by the Commonwealth that, since he was that far away from his assailant, he was in no immediate danger of his life; and that because the body of the deceased was lying on the back seat immediately after the shots were fired, the physical facts are sufficiently contradictory of appellant's testimony to submit the question of guilt to the jury. With this contention we do not agree. Ball's reputation for resisting arrest, his abusive and threatening manner extending over a period of an hour, and his absolute refusal to submit to arrest on three different occasions within the hour, were sufficient, in themselves, to create a sense of fear on the part of the officer that his life might be in danger. He was not required to wait until the knife was thrust into him to use reasonable precautions to protect his life. The Commonwealth suggests that he could have effected the arrest by hitting the deceased with his blackjack; but we are not impressed with this suggestion. If Ball, with an open knife, had been sufficiently close to be hit with a blackjack, he would have been in position to have killed the policeman with the knife. One, especially an officer attempting to make an arrest, is not required to retreat or take an unreasonable chance of death or great bodily harm, to avoid using extreme measures to protect his life. The statements made by appellant, previous to his encounter with Ball on the night of the homicide, merely showed a determination upon his part to consummate an arrest if the circumstances justified the arrest being made. These remarks did not necessarily manifest ill will on the part of appellant toward the deceased.

An officer making an arrest for a misdemeanor may not, with impunity, take the life of the misdemeanant who merely flees to avoid the arrest. Siler et al. v. Commonwealth, 280 Ky. 830, 134 S. W. 2d 945. But where

the misdemeanant forcibly resists the arrest, the law endows the officer with the right of self-defense. All of the evidence points to the fact that appellant was dealing with a rebellious and vicious prisoner, who persistently had declared he would not submit to arrest; who finally by force attempted to escape; and by word and act created a condition which any man reasonably would believe endangered the life of the officer. Under such circumstances, appellant was justified, in law, in shooting his prisoner, even though it resulted in the latter's death. The Court should have sustained the motion for a directed verdict of acquittal. Such being our view, it is unnecessary to notice the other grounds relied upon for reversal.

The judgment is reversed, with directions that it be set aside and appellant be granted a new trial, upon which, if the evidence is the same, the Court will direct the jury to return a verdict of not guilty.